UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
JOHNSON GALLAGHER MAGLIERY, LLC,       :      13 Civ. 866 (DLC)
                                       :
                  Plaintiff,           :
                                       :      OPINION AND ORDER
         -v-                           :
                                       :
THE CHARTER OAK FIRE INSURANCE COMPANY,:
                                       :
                  Defendant.           :
                                       :
---------------------------------------X

APPEARANCES:

For the Plaintiff:

John Michael Magliery and Derek Adam McNally
Johnson, Gallagher, Magliery LLC
99 Wall Street, 15th Floor
New York, NY 10005


For the Defendant:

Wystan M. Ackerman, Stephen E. Goldman, and Laura A. Torchio
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06106


DENISE COTE, District Judge:

     This case arises out of an insurance claim for losses
sustained by a business during Hurricane Sandy ("Sandy"), which
struck New York City on October 29-30, 2012.  The plaintiff, a
law firm proceeding pro se, Johnson Gallagher Magliery, LLC
("Firm"), filed a claim for lost business income from its
insurer, the Charter Oak Fire Insurance Company ("Charter Oak"),
after being forced to suspend its operations for slightly more

than two months -- from October 28, 2012 to January 7, 2013 -- due to a mandatory evacuation order and a lack of electricity, heat, telephone, and internet utility services resulting from Sandy.  Charter Oak denied the claim, and this suit followed.

On August 29, 2013, Charter Oak moved for partial summary judgment, contending that the Firm is not entitled to insurance coverage for loss of business income caused by an interruption of electrical service under a specific provision of the Firm's insurance policy with Charter Oak.  Following supplemental briefing, the motion was fully submitted on February 13, 2014. For the reasons set forth in this Opinion, the motion for partial summary judgment is granted in part.

BACKGROUND

The Firm leases office space at a building located at 99 Wall Street in Manhattan ("Building").  For the period of time relevant to this case, October 2012 to January 2013, the Firm leased the 14th and 15th floors of the Building as well as two storage rooms in the Building's basement.  The Building is supplied electricity from the Consolidated Edison of New York ("Con Edison") Bowling Green Network.

The Firm had purchased a business casualty insurance policy, written by Charter Oak, with regard to its leased premises.  The insurance policy is extensive; only the portions relevant to

2

Charter Oak's motion for partial summary judgment are summarized here.

Insurance Policy

The Firm's business casualty insurance policy with Charter Oak includes coverage for lost business income.  At issue in this partial summary judgment motion is the Firm's coverage for lost business income caused by the interruption of utility services. This coverage is found in an endorsement to the Firm's insurance policy, titled "Lawyers Endorsement."  To place the endorsement in context, however, the basic coverage for lost business income must be discussed first.

The basic coverage, set forth in a document titled "Businessowners Property Coverage Special Form" (hereinafter "primary policy"), provides lost business income coverage when the Firm is forced to suspend business due to property damage on its premises:

> We [Charter Oak] will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration."  The "suspension" must be caused by direct physical loss of or damage to property at the described premises.  The loss or damage must be caused by or result from a Covered Cause of Loss.

The Lawyers Endorsement extends the Firm's lost business income coverage to include a suspension of business due to the loss of utility services resulting from property damage not on

<u>its premises</u>:

> Utility Services – Time Element
>
> (1) When the Declarations show that you have coverage for Business Income and Extra Expense, you [JGM LLC] may extend that insurance to apply to the loss of Business Income or Extra Expense caused by the interruption of service to the described premises.  <u>The interruption must result from direct physical loss or damage</u> by a Covered Cause of Loss <u>to the following property not on the described premises</u>: (a) "Water Supply Services"; or (b) "<u>Power Supply Services</u>."

(Emphasis added.)  The term "Power Supply Services" is defined in the primary policy as:

> "Power Supply Services (a) means the following types of property supplying electricity, steam, or gas to the described premises: (1) Utility generating plants; (2) Switching stations; (3) Substations; (4) Transformers; and (5) Transmission lines and (b) does not mean overhead transmission lines."

The term "Covered Cause of Loss," which is used in the Lawyers Endorsement coverage provision to exclude coverage in certain situations, is defined in the primary policy as "risks of direct physical loss unless the loss is: (a) limited in Paragraph A.5, Limitations or (b) Excluded in Paragraph B, Exclusions." Only the Exclusions Paragraph is relevant here.

Specifically, two exclusions are pertinent to this case. The first pertains to Water:

> (B) Exclusions
>
> (1) We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence

4

to the loss.  These exclusions apply whether or not the
loss event results in widespread damage or affects a
substantial area.

. . .

> (g) Water
>
>> (1) Flood, surface water, waves, tides, tidal
>> waves, overflow of any body of water, or
>> their spray, whether driven by wind or not;
>> (2) Mudslide or mudflow;
>> (3) Water or sewage that backs up or
>> overflows from a sewer, drain, or sump; or
>> (4) Water under the ground surface pressing
>> on, or flowing or seeping through:
>>> (a) Foundations, wall, floors or paved
>>> surfaces;
>>> (b) Basements, whether paved or not;
>>> (c) Doors, windows or other openings;
>> all whether naturally occurring or due to man
>> made or other artificial causes.
>
> But if Water, as described in Paragraphs (1)
> through (4) above results in fire, explosion, or
> sprinkler leakage, we will pay for the loss or
> damage caused by that fire, explosion, or
> sprinkler leakage.

The Firm also purchased a separate endorsement, titled
"Sewer or Drain Backup Extension," that provides business
interruption coverage for losses "caused by or resulting from
water or sewage that backs up or overflows from a sewer, drain,
or sump."  Paragraph B.1.g.3 of the Water Exclusion does not
apply to the Sewer or Drain Backup Extension.

The second exclusion relates to "acts and decisions" and
reads as follows:

> (3) We will not pay for loss or damage caused by or
> resulting from any of the following under Paragraphs a.

through c.  But if an excluded cause of loss that is
listed in Paragraphs a. and b. below results in a
Covered Cause of Loss, we will pay for the resulting
loss or damage caused by that Covered Cause of Loss.

. . .

b. Acts or decisions, including the failure to act or
decide, of any person, group, organization, or
government body.

Hurricane Sandy

The following discussion is based principally on a Con
Edison report titled "Preparation and System Restoration, Sandy,
October 29 through November 12, 2012" and published on January
11, 2013 ("Con Edison Report").  Sandy was the one of the largest
and strongest storms ever observed in the Atlantic Ocean.  With
peak winds exceeding 90 mph and a record storm surge exceeding
fourteen feet, Sandy caused a massive failure in electrical
coverage in the New York City area, leaving more than one million
Con Edison customers without power.

In the days leading up to Sandy, Con Edison identified three
networks, including the Bowling Green Network, as possibly
requiring preemptive shutdown.  Con Edison had learned,
subsequent to Tropical Storm Irene in 2011, that 460 volt
equipment would "fail catastrophically during a flood event
involving brackish salt water."  Con Edison identified fifteen
electrical networks in New York "as having 460 volt services in
jeopardy of failure due to the potential of flooding."  "Based on

the number of feeders supplying the 460 volt equipment in each network, 12 of the 15 networks allowed for these feeders to be preemptively removed without jeopardizing the integrity of the network."  Three networks, however, "could not sustain supply" if the feeders supplying the 460 volt equipment were removed.  Con Edison therefore determined that, "if necessary, these 3 networks would be preemptively shutdown to protect equipment and address public safety."

On October 28, 2012, the day before Sandy hit, Mayor Michael Bloomberg of the City of New York issued Executive Order 163, which declared a state of emergency in New York and issued a mandatory evacuation order for Zone A, as defined by the Office of Emergency Management.  The Building is located in Zone A. Evacuation was required by 7 p.m. on October 28.  Meanwhile, Con Edison installed sandbags to protect underground transformer vault locations in flood zones.

On October 29, the day that Sandy hit, Con Edison assigned observers to critical network areas to monitor flooding.  Because Sandy's storm surge of 14.06 feet exceeded the 11.7 feet forecast, these observers reported that water levels were rising above the protective barriers installed at transformer faults. "At that point," Con Edison "preemptively shut down three networks to prevent extensive customer and network equipment damage and to reduce the time required to replace or repair

equipment necessary to restore the networks."  As relevant here, the Bowling Green Network was preemptively shut down on October 29, 2012 at 6:42 p.m.  The preemptive shutdown of the Bowling Green Network did not cause any physical damage to the network.

Over the next two hours, "[s]evere flooding . . . caused the shutdown" of the East 13st Street transmission station, the East River transmission station, and the Seaport No. 1 sub-station, causing eleven more networks in Manhattan to lose power.  With fourteen electrical networks down, much of lower Manhattan was shrouded in darkness.

After the storm ended on October 30, Con Edison began restoration work.  "In order to restore" the three networks that were preemptively shutdown, which includes the Bowling Green Network, Con Edison "had to assess all distribution electric facilities in the flood areas to determine if equipment needed to be isolated before energization."  "In order to assess damage, most facilities required extensive pumping."  "In addition to sea water, crews faced environmental damages including diesel fuel, kerosene, and raw sewage."  Con Edison found the following:

> Extensive water damage was found in most locations, and defective equipment needed to be isolated before the networks could be energized.  This involved over 250 sites and 1000 transformers and associated network protectors.  Emergency procedures were implemented to expedite the isolation of high voltage feeders from damaged equipment to allow the restoration of non-damaged distribution equipment to service.

8

Once the assessment phase was completed, Engineering determined the minimum number of feeders required to energize each network grid safely.  As the defective equipment was isolated, the remaining equipment was prepared for energization.  This included preemptively closing equipment on feeders that would be restored to service to avoid overloads in any areas.  Once the network grid was energized, customers that were not affected by the flood waters were restored.

Peter Turadek ("Turadek"), a senior engineer in Con Edison's distribution department, was deposed and supplemented the Report as follows.  Turadek testified that flooding damaged the Bowling Green Network equipment.  He stated that, although the preemptive shutdown prevented extensive damage to the equipment, "there still was damage due to the salt water."  He described the "damage" as "contamination," stating that water inundated the equipment and left a residue -- consisting of dirt, debris, or salt -- such that "when you energized [the equipment,] it would fail or flash over."  Thus, Con Edison's restoration efforts required that the equipment be cleaned, tested, and sometimes replaced.  This applied specifically to the equipment in the Bowling Green Network.  When asked whether Con Edison's distribution network in Manhattan suffered any effects during Sandy other than water, Turadek responded that it appeared to him that "it was all due to water."

At 1:33 a.m. on November 3, the Bowling Green Network was re-energized.  The Building, however, did not actually receive

9

electricity from Con Edison until sometime on November 11.
Moreover, under Executive Order 165, New York City did not permit
re-occupation of buildings in Zone A until it gave specific
approval.  The approval to re-occupy the Building came on
November 14.  Even then, however, the Building's landlord, The
Claremont Group LLC ("Claremont"), did not invite tenants to
return until November 16, due to "continuing internal
electrification efforts."  Finally, even though electricity
service had been restored to the Building and to the Firm's
floors as of November 16, telephone and internet services were
not restored until January 7, 2013.

On or around October 31, 2012, the Firm filed an initial
claim with Charter Oak for losses from Sandy, including lost
business income.  On December 3, 2012, Charter Oak denied the
claim, citing the Water exclusion.


Procedural History

On January 7, 2013, the Firm filed suit in New York state
court against Charter Oak, alleging breach of contract and
seeking compensatory damages.  On February 6, Charter Oak removed
the case to this Court on diversity grounds.

At the initial conference on March 1, the Court was advised
that a report by Con Edison regarding Sandy could prove critical
in evaluating each party's position.  Accordingly, the parties

served a joint subpoena on Con Edison for the Sandy Report.
Before completion of fact discovery, Charter Oak filed a motion
for partial summary judgment on August 29.  The motion consists
of three arguments, the third of which pertains to the Water
exclusion.  On October 9, the Firm filed its opposition to the
partial summary judgment motion, as well as a request for
additional discovery under Rule 56(d), Fed.R.Civ.P.  After the
Firm was given an opportunity for further discovery, supplemental
briefing was completed on February 13, 2014.

DISCUSSION

Summary judgment may not be granted unless all of the
submissions taken together "show[] that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts in the light most favorable to the non-
moving party.  Eastman Kodak Co. v. Image Technical Servs., Inc.,
504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d 130,
132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and

cannot "rely merely on allegations or denials" contained in the pleadings.  Rule 56(e), Fed.R.Civ.P.; see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The parties have not addressed the issue of which law applies to this contractual dispute.  The parties' memoranda of law, however, apply New York law.  "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state."  Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012).  Pursuant to New York's choice-of-law rules, an agreement between the parties to apply New York law, even where that agreement is implicit, is sufficient to establish the appropriate choice of law.  Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566-67 (2d Cir. 2011).  Accordingly, the Court will apply New York law.

Under New York law, insurance contracts are interpreted "to

12

give effect to the intent of the parties as expressed in the clear language of the contract." <u>Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.</u>, 702 F.3d 118, 122 (2d Cir. 2012) (citation omitted). "Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage." <u>Consol. Edison Co. of N.Y. v. Allstate Ins. Co.</u>, 774 N.E.2d 687, 690 (N.Y. 2002). "[B]efore an insurance company is permitted to avoid policy coverage," the insurer "must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation." <u>Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.</u>, 908 N.E.2d 875, 877 (N.Y. 2009) (citation omitted). "Any such exclusions or exceptions from policy coverage must be specific and clear in order to be enforced" and "are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction." <u>Id.</u> (citation omitted). If, however, "an insurer establishes that a policy exclusion applies, the burden shifts to the policyholder to prove that an exception to that exclusion applies." <u>Ment Bros. Iron Works Co., Inc.</u>, 702 F.3d at 122 (citation omitted).

One preliminary observation is in order before turning to the merits. Charter Oak's motion for partial summary judgment is narrow. Charter Oak seeks a ruling about coverage under the

"Utility Services – Time Element" provision in the Lawyers Endorsement when there is an interruption in electrical service. Thus, this motion does not address lost business income caused by sewage backup on the Firm's premises, or an interruption of other utility services, such as telephone and internet.  Rather, the only issue before the Court is whether the Firm may recover under its insurance policy for lost business income when that loss was due to the interruption of electrical service to the Building. This interruption lasted two weeks: from October 29 through November 11.

Relying on the Con Edison Report, Charter Oak presents three arguments for why the Firm is not entitled to such coverage. First, there was no "direct physical loss or damage," because the Bowling Green Network was not damaged but rather preemptively shut down.  Second, the "acts or decisions" exclusion applies, because the loss of electrical service was attributable to a decision by Con Edison.  Third, the "Water" exclusion applies, because any damage to the Bowling Green Network was caused by water.

Charter Oak has shown that the Firm is not entitled to insurance coverage for the interruption in electrical service for roughly one week: from October 29 through 1:33 a.m. on November 3, the period of time that the Bowling Green Network was shut down.  Charter Oak has not shown, however, that it is entitled to

14

summary judgment for November 3 through November 11 -- the week or so before Con Edison delivered electricity to the Building.

## I. "Direct Physical Loss or Damage"

Charter Oak contends that the Firm is not entitled to lost business income coverage from the loss of electrical service under the Lawyers Endorsement coverage provision because the interruption in electrical service was not a result of "direct physical loss or damage" to Con Edison's power supply services. Under the Lawyers Endorsement coverage provision, the loss of business income must be "caused" by an interruption in utility service that "results from" "direct physical loss or damage" to Con Edison power supply services.  Charter Oak contends that the interruption in the Building's electrical services resulted from Con Edison's preemptive shutdown of the Bowling Green Network, and that the preemptive shutdown itself caused no physical damage to the Bowling Green Network.

To the contrary, the Con Edison Report states that the networks that were preemptively shut down, which includes the Bowling Green Network, suffered "extensive water damage" "in most locations" as a result of Sandy.  Furthermore, the Report establishes that, even though Con Edison began restoration efforts immediately after Hurricane Sandy receded on October 30, the Bowling Green Network was not re-energized until a few days

15

later, on November 3.  Turadek's testimony confirms that the
Bowling Green Network was damaged from flooding during Sandy.  To
be sure, the decision to preemptively shut down the network
prevented far worse damage to the power system and shortened the
duration of the business interruption in lower Manhattan, but the
undisputed evidence demonstrates that Sandy caused "direct
physical loss or damage" to the Con Edison power supply services.
As a result, Charter Oak is entitled to summary judgment on this
prong of its motion for only a few hours: the time between the
preemptive shutdown and the arrival of Sandy and its invading
(and damaging) flood tide.


II. "Acts or Decisions" Exclusion

     Recovery for those same few hours on October 29 is also
barred by a policy exclusion.  The exclusion at issue is for
"acts and decisions" of an organization or government body.
Charter Oak has shown that the decision to shut down the Bowling
Green Network preemptively was responsible for a few hours of the
loss of power to the Building before Sandy's waters damaged the
Bowling Green Network.

     To the extent that Charter Oak relies on this exclusion to
avoid coverage beyond those few hours, however, that portion of
its motion is denied.  It is undisputed that Con Edison's
preemptive shutdown of the Bowling Green Network caused no

physical damage to Con Edison's power supply services.  Indeed, it was Charter Oak that submitted the affidavit establishing this fact.  When the flood waters from Sandy entered the network, however, they damaged it and prevented it from being immediately restored.  Thus, Charter Oak cannot invoke the "acts or decisions" exclusion to relieve it of the obligation to insure the Firm for the business interruption losses that followed those initial few hours of the storm.  The electrical service loss that followed that short period was proximately caused by the damage to the Bowling Green Network resulting from Sandy.

Both parties devote the entirety of their briefing on this exclusion to issues of whether Con Edison is a civil entity, the loss was fortuitous, or the preemptive shutdown itself caused another Covered Cause of Loss.  It is unnecessary to address these issues when, at best, Charter Oak would be entitled to escape liability under this exclusion for only a few brief hours of the claimed coverage period, and as just described, coverage for these hours is also barred by the policy requirement that interruption in electrical services be caused by direct damage to the power supply services.

III. Water Exclusion

In its third and final argument, Charter Oak invokes the exclusion for "Water."  As quoted above, the Water exclusion is

17

broad; it includes flood waters and overflows from any body of water, and the exclusion extends to all damage caused "directly or indirectly" by water.[1]

The Con Edison Report states that, when Con Edison began restoration of the networks that were pre-emptively shut down, which includes the Bowling Green Network, Con Edison found that these networks had suffered "extensive water damage" "in most locations." (Emphasis added.)  Turadek also repeatedly characterized the damage to Con Edison's equipment as "water" damage.  Charter Oak has thus shown through the Report, as confirmed by Turadek, that water caused "direct physical loss or damage" to the Bowling Green Network that prevented the re-energizing of the network until 1:33 a.m. on November 3.  This is an excluded cause of loss from the Firm's insurance policy.

In its initial opposition papers, the Firm presents three arguments attempting to raise a question of material fact regarding this conclusion of the Con Edison Report, none of which

---

[1] Charter Oak suggests that the Sewer or Drain Backup Extension applies only to the primary policy and not to the Lawyers Endorsement, and therefore that the full Water Exclusion, including water or sewage that backs up or overflows from a sewer, drain, or sump, applies in the context of the present motion, which pertains only to the Firm's coverage under the Lawyer's Endorsement.  Although it is not necessary to reach the Sewer and Backup Extension in resolving the present motion, there does not appear to be any textual support for Charter Oak's argument.  The Sewer or Drain Backup Extension appears to apply equally to the business interruption coverage provided in the Lawyers Endorsement.

is persuasive.  First, the Firm argues that the Con Edison Report does not "definitively" state that the Bowling Green Network sustained water damage.  While the Report does not list that network separately by name in that portion of its discussion, when read as a whole, there is no other conclusion to be drawn. Moreover, Turadek does definitively state that the Bowling Green Network sustained water damage.  The Firm has not offered any evidence to create a legitimate dispute on this issue of fact.

Second, the Firm points to the following sentence in the Con Edison Report: "In addition to sea water, crews faced environmental hazards including diesel fuel, kerosene, and raw sewage."  The Firm contends that the Con Edison Report thus raises a possibility that the damage to the Bowling Green Network was the result of something other than water.

This argument fails.  The sentence on which the Firm relies is a description of the challenges that Con Edison's restoration teams faced.  It says nothing about the underlying cause of damage to the Bowling Green Network.  In any event, even if some damage was caused by fuel or kerosene, these hazards appeared because of the invasion of "sea water."  Because any damage from fuel or kerosene would have been associated with flooding, it still falls under the Water exclusion, which includes both direct and indirect damage resulting from water.

Third, the Firm points to a sentence in the Con Edison

19

Report that some of Con Edison's customers were "not affected by the flood waters" but were still without electricity.  This sentence, however, has no bearing on the question at hand.  This sentence is about individual customers, whereas the question here is whether the damage to the Bowling Green Network was caused by water.

The parties were given an opportunity to supplement their briefing so that the Firm could undertake the additional discovery that it contended was necessary to oppose the grant of summary judgment.  In its supplemental opposition, the Firm principally argues that summary judgment is not warranted on the Water exclusion because additional discovery has established that Con Edison's electrical system was not damaged by flooding from Sandy.[2]

This argument fails.  To begin, in making this contention the Firm largely mischaracterizes Turadek's testimony to suggest that Con Edison's electrical system was not damaged by flooding. In fact, Turadek testified to the exact opposite.  He explained that, while the Bowling Green Network was preemptively shut down

_____

[2] The Firm's second argument is that any damage to the electrical equipment in the Building resulted from sewer, drain, or sump backup, and is thus a covered cause of loss.  As explained above, Charter Oak's partial summary judgment motion is not based on the Firm's claim to business interruption coverage under its primary policy, i.e., due to damage in the Building.  Charter Oak confirms this position in its reply.  Accordingly, this Opinion does not address the Firm's alternate contention and any related

to prevent extreme flood damage, it nevertheless suffered water damage due to salt water contamination.  This contamination constituted water damage, because the equipment had to be cleaned and tested before it could be energized, or replaced.  Indeed, when Turadek was asked whether any explanation other than water could explain the damage to Con Edison's distribution network, Turadek stated that it was all due to water.  Thus, Turadek's testimony indisputably supports the position that Con Edison's electrical system was damaged by flooding, and the Firm's reliance on Turadek to create a disputed question of fact is misplaced.

Beyond Turadek, the Firm points to a single sentence from a deposition of William Tubman ("Tubman"), a customer project manager at Con Edison.  When asked whether he had "any reasons to think that there was any mechanical obstacle to re-energization of the power on Con Edison's side to the supply of 99 Wall Steeet after Sandy," Tubman responded, "Other than to the customer's equipment, not to my knowledge."

Given the overall context of Tubman's testimony, the single sentence does not raise a genuine question of material fact as to whether Con Edison's electrical system was damaged by flooding from Sandy.  To begin, the absence of a mechanical obstacle is not the same as the absence of physical damage.  Indeed,

arguments.

elsewhere in his deposition, Tubman sets forth his understanding
that the Con Edison equipment suffered "water damage."  Moreover,
Tubman is not an engineer.  He is a middleman with Con Edison's
customers, and in his deposition he principally discussed his
knowledge of the delays that Claremont (the Con Edison customer)
experienced in re-energizing the Building after the Bowling Green
Network was restored.  He admitted that he had no knowledge of
why Con Edison waited until November 3 to re-electrify the
Bowling Green Network.  Thus, Tubman has no personal knowledge
relating to the period before November 3 to suggest that water
did not invade and damage the Bowling Green Network.

Finally, the Firm relies on a single document titled
"Superstorm Sandy -- Outage Cause Information."  The first page
of this document states that the information contained therein is
provided for the use of insurers in determining "the cause of
electrical outages" for purpose of adjusting business
interruption claims.  It then lists three categories of "the
causes of electric outages" resulting from Sandy -- wind damage,
flooding, and preemptive shutdown to preserve the integrity of
the electric system.  The document then lists, for Westchester
County and each borough in New York City, the causes of the
outages in the networks that lost power during Sandy.  The outage
in the Bowling Green Network during Sandy is categorized as
preemptive shutdown.  The Firm argues that, because the cause of

the Bowling Green Network outage is listed as preemptive shutdown
and not flooding, this establishes that Con Edison's electrical
system was not damaged by flooding.

This document does not, however, constitute evidence that
there was no water damage to the Bowling Green Network from
Sandy.  Assuming that the document is an admissible Con Edison
record,[3] it is of dubious evidentiary value.  Besides having the
words "Con Edison" in the header, there is no cover page
establishing that the document is provided by Con Edison.  More
important, there is no explanation of methodology or purpose.
The document consists only of three pages of text and diagrams,
followed by a lengthy appendix consisting entirely of diagrams of
what appear to be Con Edison electrical networks.  Moreover, the
document has worrisome inconsistencies.  The first page is dated
December 13, 2012, whereas the second and third pages are dated
November 26, 2012.

In any event, while the document distinguishes between
networks for which the cause of the outage was flooding versus a
preemptive shutdown, the cause of the outage is not the same as
the cause of damage.  Only the latter is relevant in applying the
Water exclusion.  In other words, nothing in this document
states, suggests, or even implies that a network that was

---

[3] The parties have not offered evidence of authentication but do
not dispute that the document is a Con Edison record.

preemptively shut down could not <u>also</u> have suffered flood damage. Thus, on the crucial questions of whether the Bowling Green Network suffered damage and whether the cause of such damage was water, the only relevant evidence in the record is the Con Edison Report and Turadek's testimony, both of which establish that the Bowling Green Network suffered damage due to water.[4]

In sum, the Firm has failed to raise a genuine question of material fact to dispute the conclusion of the Con Edison Report and Turadek testimony that the damage to the Bowling Green Network was caused by water, which is an excluded cause of loss. Accordingly, the Firm cannot claim lost business coverage for the interruption in its electricity service from the shutdown of the Bowling Green Network, <u>i.e.</u>, until 1:33 a.m. on November 3.

Charter Oak has not shown, however, that Con Edison's failure to supply power to the Building for the days following November 3 was caused by water damage to Con Edison power supply services.  Thus, Charter Oak's request for partial summary judgment from November 3 through November 11 is denied.[5]

---

[4] It is curious that the Firm would take the position that Con Edison suffered no damage from Sandy because the Bowling Green Network was preemptively shutdown.  In its initial opposition to the motion, the Firm suggested that Sandy damaged, or at least might have damaged, the Con Edison distribution system.

[5] In its supplemental opposition, the Firm also relies on the deposition of Carla Pappalardo, an official representative of its landlord, Claremont, as well as other portions of Tubman's deposition.  Both of these depositions, however, speak almost

CONCLUSION

Defendant's August 29, 2013 motion for partial summary judgment is granted in part.  Plaintiff is not entitled to coverage, under the "Utility Services – Time Element" provision in the Lawyers Endorsement, for lost business income from October 29, 2012 until 1:33 a.m. on November 3, 2012.


SO ORDERED:

Dated:   New York, New York
         March 18, 2014



_____
DENISE COTE
United States District Judge




exclusively to the issue of the electrical interruption at the Building after the Bowling Green Network was re-energized on November 3.  Thus they are not relevant to the issue on which this Opinion grants partial summary judgment.

Additionally, the Firm observes in a footnote that, despite taking two depositions of Con Edison employees, it has yet been unable to depose the Con Edison employee, Maria Rodriguez, who provided the affidavits in support of Charter Oak's partial summary judgment motion.  The Firm, however, has not renewed its request for additional discovery under Rule 56(d), Fed.R.Civ.P. Thus the Firm has waived any argument that it was unable to oppose summary judgment on the Water exclusion due to its inability to depose Ms. Rodriguez.